**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
James M. Treglio (SBN 228077)
Isabel Rose Masanque (SBN 292676)
classactions@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiff, on behalf of himself and all others similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SCOTT EVANS, on behalf of himself and all others similarly situated,

Plaintiffs,

v.

MH SUB I, LLC, a Delaware Corporation, and DOES 1-100, inclusive

Defendants.

CASE NO. 3:26-cv-02684-VC

**FIRST AMENDED CLASS COMPLAINT FOR VIOLATIONS OF:**

**(1) PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);**
**(2) WIRETAP ACT, 28 U.S.C. § 2510 *et seq*.**
**(3) CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);**
**(4) ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and**
**(5) CAL. BUS. & PROF. CODE §17200, ET SEQ. (CALIFORNIA UNFAIR COMPETITION LAW)**

**DEMAND FOR JURY TRIAL**

Class Representative Plaintiff Scott Evans ("Plaintiff"), by and through his attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1. Defendant MH SUB I, LLC, a Delaware Corporation ("Defendant") owns and operates the website https://www.findlaw.com/ (the "Website" or "Findlaw").

2. When users visit the Website, Defendant causes numerous trackers and cookies developed and operated by Meta, Google and Microsoft (the "Trackers") to be installed on Website visitors' internet browsers. Defendant then uses these Trackers to collect Website visitors' identifying information, as well as dozens of other data points that reveal the users' behavior and activity on the Website, subjecting the user to unwanted and intrusive communications by would-be advertisers trying to sell the same or similar product to the user over and over and over again.

3. Because the Trackers intercept information about the Website visitors' interactions with the Website, the Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA").

4. Because the Trackers also capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of CIPA. See *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023). By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

5. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of the ECPA and CIPA.

## PARTIES

6. Plaintiff Scott Evans resides in Redwood City, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when he visited the Website.

7. Defendant MH SUB I, LLC, is a Delaware Corporation, with its principal place of business located in El Segundo, California.

**VENUE AND JURISDICTION**

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 proposed class members, and minimal diversity exists. This Court has personal jurisdiction over Defendant because Defendant transacts business in this District, has purposefully availed itself of the privilege of conducting business in California, and the claims alleged herein arise out of or relate to Defendant's conduct directed at this District and the State of California. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant resides in this District for venue purposes and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including in San Mateo.

**I. INTRODUCTION**

**A. The California Invasion of Privacy Act**

1. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

2. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also *Greenley, supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in

accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

3. Individuals may bring an action against the violator of any provision of CIPA—including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Federal Wiretap Act**

4. The ECPA was originally enacted in October 1986 to extend privacy protections to emerging technologies. In drafting the legislation, Congress acknowledged that "[t]he dramatic development of the Internet has transformed methods of gathering, processing and sharing information." Senate Judiciary Committee Report (S. Rep. No. 99-541, 1986). Therefore, the statute aimed to address "individuals' concerns that a sufficient degree of privacy and the integrity of personal information are maintained in an age of modern communications and information storage." *Id.*

5. Although limiting overreach by law enforcement was one of the main purposes of the statute, the ECPA explicitly applies to private actors, including "any individual, partnership, association, joint stock company, trust, or corporation" who illegally intercepts, or attempts to intercept, "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C.A. § 2510(4)(6).

6. The statute authorizes individuals to recover civil damages of up to $10,000 from any person who violates the provisions of the ECPA.

## II. DEFENDANT ILLEGALLY INTERCEPTS THE CONTENTS OF ELECTRONIC AND WIRE COMMUNICATIONS AND ILLEGALLY CAPTURES IDENTIFYING INFORMATION

**A. Overview of Website Tracking Technology**

7. Website tracking technology originally consisted of simple tools such as first-party cookies accessible only by the domain (website address) that set the cookies. However, as online advertising and analytics advanced, the industry increasingly relied on third party cookies which are set and accessed by domains other than the website a user originally visited. Over time, websites

began implementing techniques which enabled the sharing of data collected by first-party cookies with third party domains, giving them access to user activity.

8. In addition to first-party and third-party cookies, the technology has further evolved into an advanced and interconnected system of methods that are capable of tracking the behavior of users across multiple websites, devices, and sessions using tools such as pixels, device "fingerprinting," and other real-time data exchanges.

***i. Cookies***

9. A cookie is a small text string with data created by a website's server and transmitted to a web browser, which then stores the string on the user's device. When the user revisits the website, the browser sends the string along with the HTTP request, allowing the tracker to recognize the user and build sophisticated profiles. These cookies can remain on the device for years, enabling long-term tracking and profiling.

10. When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

11. Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their device, as the process occurs in the background without any visible signs.

***ii. Pixels***

12. Pixel "events" are JavaScript tracking codes that send detailed information about user actions to third-party servers, such as Facebook and Google, in real-time.

13. Common user events tracked by Pixels include page views (when a user loads a specific webpage), content views (when a user interacts with a specific piece of content on a webpage), clicks (when a user selects a specific element on a webpage), form submissions (text or data a user inputs into a field on a webpage), and search queries (terms or phrases a user enters into a search box on a webpage).

14. Importantly, Pixel events represent a coordinated surveillance arrangement between websites and tech giants, like Facebook. A website lets Facebook watch their customers, and Facebook provides free tracking and analytics in exchange for data. Both profit from the arrangement at the expense of consumer privacy.

***iii. Device fingerprinting***

15. Device fingerprinting refers to a broad category of techniques that are used to identify a user's device across visits (also called "sessions"). It works by collecting information about a user's hardware and software attributes, such as browser type, operating system, screen resolution, installed fonts, and time zone and language settings. The combination of these attributes becomes the user's "device fingerprint."

16. When combined, the probability that two users have identical attributes and settings is very low, even if they have the same type of device or browser. This is because the technical characteristics still vary based on individual configuration and software versions, which allow trackers to accurately and uniquely identify users without relying on cookies.

17. Canvas fingerprinting is a specific type of device fingerprinting that identifies and tracks a user's device based on these unique characteristics. It works by downloading a Javascript code when a user visits a webpage and runs it in the user's browser. This initiates a process completely invisible to a user.

18. The Javascript creates an invisible HTML canvas element—like a digital drawing board—and draws texts, shapes, and emojis on the canvas using various fonts and colors. The script then reads back the exact pixel values of what it just drew and runs these pixels through a mathematical function (a "hash") that converts them into a "unique identifier." This unique identifier becomes the user's "device fingerprint."

19. The Javascript sends this fingerprint to a server, and the server uses it to recognize a user on future visits, without the use of any cookies.

20. The reason this process creates a unique identifier is because devices render graphics slightly differently based on their graphics card model, driver version, installed fonts, operating systems, screen resolution, and color calibration. These tiny variations create a unique pattern—

like a fingerprint—that is remarkably stable and hard to change. This fingerprint persists even if a user clears their browser data.

***iv. IP Addresses***

21. IP addresses serve an important functional role on the internet by acting like a digital postal address that allows devices to send and receive data.

22. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

23. Functionally, to make a website load on a user's internet browser, the browser sends an "HTTP request" to Defendant's server where the relevant website data is stored.

24. In response to the request, Defendant's server sends an HTTP response back to the browser with a set of instructions.

25. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

26. Thus, the IP address enables a device to communicate with another device, such as a computer's browser communicating with a server.

27. However, IP addresses can also be used as potential user identifiers, especially when used in combination with additional data collected from the techniques described above.

28. Through an IP address, the specific device's state, city, and zip code can be determined.

29. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device or household Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."

30. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code" and (ii) "to target specific households, businesses[,] and even

individuals with ads that are relevant to their interests." Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service" because "[c]ompanies can use an IP address … to personally identify individuals."

31. For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis. Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising." "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."

32. In addition, "IP address targeting can help businesses to improve their overall marketing strategy." "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."

33. Public IP addresses enable companies to monitor user interactions and behaviors across various websites and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

34. They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

35. By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

36. For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

37. For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

***v. Session recording***

38. Session recording tools capture and replay user interactions on websites, creating a video-like recording of browsing sessions. They monitor mouse movements (every pixel traveled), clicks (what you clicked and where), scrolling (how far, how fast), form inputs (what you type, including deletions), page navigation (every page visited), and time spent on each element.

39. Importantly, session recording is qualitatively different from cookies or analytics. It is not just counting pageviews—it is creating a surveillance video of a user's online behavior.

40. Session recorders are highly invasive because of the level of nuance captured during a session. Because it captures deleted content, if a user types a message and deletes it, the recording captures exactly what they explicitly chose not to submit. It also reveals other user behaviors such as user hesitation, since it can record how long a use hovered over a "Buy Now" button before clicking on it (or not).

41. Session recorders have the potential to capture sensitive data such as passwords, credit cards, and health information, if not properly configured.

42. Moreover, real people at the companies who own the session recording technology have the ability to watch replays of user sessions and recordings are stored indefinitely for analysis.

**B. Tracking Technology on Defendant's Website**

43. Using a combination of the tracking technologies described above, Defendant actively shared user data with multiple third parties, including Meta, Google and Microsoft by deploying tools and scripts developed by these companies that collected, transmitted, and processed information from users who accessed the Website.

44. Specifically, forensic testing confirmed that the Website deployed 95 third-party trackers, including 41 cookies, 5 different canvas fingerprints, and 1 session recorder. Defendant further shared data collected by these trackers with three major advertising networks.

***i. Session Recorders***

45. Defendant deployed Microsoft Clarity session-replay technology on the Website, including on the legal search-results page accessed by users before any meaningful consent or opt-out choice was presented.

46. Microsoft Clarity captured, or was configured to capture, a visual replay of a user's browsing session on the Website, including screen activity, cursor movements, clicks, scrolling behavior, page navigation, and time spent interacting with particular page elements.

47. The session recorder is highly invasive because it does not merely count page views or collect aggregate analytics. It creates a detailed, replayable record of an individual user's behavior on the Website. The captures keyboard input and form interactions, including information a user typed, edited, or deleted before submitting anything to the Website.

48. Using Microsoft Clarity, Defendant captured and recorded users' interactions with legal-search content on the Website, including sensitive legal research activity. This included user activity associated with a search, revealing the user's specific legal concern and allowing Defendant and Microsoft to review or analyze that conduct after the browsing session occurred.

***ii. Google Tracking Technology***

49. Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising bringing in a grand total of $305.6 billion. Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level.

50. Defendant embedded Google Ads and Google DoubleClick scripts on its Website, which allowed it to actively share detailed information about users with Google, including device and browser characteristics, page views, and content views.

51. Defendant also used Google Tag Manager to load and coordinate additional Google tracking scripts on the Website, including Google Analytics and Google Ads scripts. Those scripts performed canvas fingerprinting, collecting device- and browser-rendering characteristics such as font rendering, geometry rendering, and canvas data extraction. This fingerprinting created or

contributed to a persistent browser/device identifier that could be used to recognize a user even where traditional cookies were unavailable, blocked, or cleared.

52. As a result, Defendant shared users' sensitive legal-research activity with Google. This included activity associated with a search, which revealed a specific legal concern. Through Google Analytics, Google Ads, Google DoubleClick, and Google Tag Manager, Defendant enabled Google to receive and process legal-search-related user activity for analytics, advertising measurement, conversion tracking, retargeting, audience creation, and cross-site profiling.

53. Additionally, the Website uses Google Tag Manager to deploy a script to perform canvas fingerprinting. This unique identifier is what allows Defendant and Google to track users across multiple websites.

54. Finally, if the user is logged into their Google account when visiting the Website, Google receives third party cookies allowing it to link the data collected by the code to the specific Google user, and derive demographic information about that user, such as age and gender.

***iii. Meta/Facebook Pixel Tracking Technology***

55. Facebook is a social media platform and social networking service that also offers an advertising and analytics tool called Meta Pixel. The Meta Pixel is a snippet of code integrated into a website that enables businesses to "measure, optimize, and build audiences" for their ad campaigns by tracking user actions and behavior.[1] Once installed, the pixel is activated as soon as a user visits a website.[2]

56. Defendant embedded Meta/Facebook Pixel tracking technology on the Website and caused it to operate before obtaining users' consent. The Meta Pixel fired when users visited the Website, including pages where users searched for and viewed sensitive legal information. Through this tracking technology, Defendant caused Meta to receive information about users' browsing behavior, page views, engagement data, IP addresses, URLs visited, referrer information, browser information, device characteristics, and device/browser identifiers.

---

[1] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel; https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[2] *Id.*

57. Defendant's use of the Meta Pixel disclosed information sufficient to reveal the legal topics users were researching and the manner in which users interacted with the Website. This included information associated with users' searches for legal issues, the specific legal-content pages users visited, the timing of those visits, and technical identifiers that allowed Meta to recognize, match, and profile the user across browsing sessions, devices, and websites.

58. Data from the Website is combined with Facebook's broader tracking network across millions of websites, creating comprehensive profiles of users' interests. Meta uses this data to show users targeted ads across Facebook, Instagram, and partner websites, or other ads for similar or related services based on what the user showed interest in during their visit.

59. Facebook explains: "Once matched, we can tally [user] actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns. By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."

***iv. Advertising Networks***

60. An advertising network is a system that connects advertisers with websites by collecting data about how users interact with a website and delivering relevant ads based on the user's behavior. These advertising networks use unique identifiers—such as cookies or device fingerprints—to persistently monitor users across different websites and build a highly detailed behavioral profile of each user over time.

61. Defendant embedded and caused advertising-network technology to execute on the Website immediately upon page load and before users were given any meaningful opportunity to consent. The pre-consent desktop and mobile investigations detected no cookie-consent banner or pop-up opt-out mechanism, yet detected three advertising networks operating on the Website: Microsoft Advertising, Google Ads/DoubleClick, and Facebook/Meta Ads. The reports further detected 41 cookies, 102 third-party tracker requests on desktop, 105 third-party tracker requests on mobile, five canvas-fingerprinting instances, and one Facebook/Meta Pixel PageView event. These trackers operated on Defendant's legal-search page, including a page reflecting a search for

"landlord deposit hold back bad faith," and the Website also stored that legal-search phrase in browser local storage as a recent search.

62. By embedding this advertising-network code, Defendant caused the Website to transmit or make available to third-party advertising networks extensive information about users' browsing behavior and identity, including page views, page URLs, timestamps, IP addresses, referrer information, user-agent and browser information, device characteristics, advertising identifiers, cookie identifiers, and event data. The Meta Pixel PageView event transmitted the page URL, timestamp, IP address, user agent, referrer information, and device/browser fingerprint to Meta for advertising purposes, including retargeting, ad measurement, audience building, and ad-delivery optimization. Google's tracking infrastructure also collected device/browser fingerprinting data through canvas-font rendering, canvas-geometry data, and data-URL extraction, enabling persistent identification beyond ordinary cookie-based tracking.

63. These advertising networks also collect data on parameters that indicate how likely a user may buy a product or service—commonly known as "purchase intent signals." The advertising networks then uses this data to show users ads based on their browsing behavior on Defendant's Website and other websites.

***iv. Canvas Fingerprinting***

64. Defendant implements extensive canvas fingerprinting on the Website before obtaining user consent. The desktop and mobile pre-consent reports each detected five separate canvas-fingerprinting instances operating on the Website. These instances were associated with Defendant's own domain and Google tracking infrastructure, including Google Tag Manager, Google Ads, and Google Analytics.

65. The detected canvas fingerprinting collected device- and browser-specific rendering characteristics, including canvas font rendering, canvas geometry, and data URL extraction. These techniques allow a website and its third-party tracking partners to generate a unique browser and device signature that can identify and recognize a user even when ordinary cookies are blocked, deleted, or unavailable.

66. By integrating five separate fingerprinting instances into the Website, Defendant created a highly detailed and persistent tracking mechanism capable of identifying users across browsing sessions and websites. The reports state that canvas fingerprinting enables persistent tracking without user consent and creates unique device signatures that are difficult for users to detect or avoid.

67. The fingerprinting occurred on Defendant's legal-search page, including a page reflecting a user's search. As a result, Defendant did not merely collect generic technical information. It caused fingerprinting technology to operate in connection with users' sensitive legal research and to associate that legal-search activity with persistent device and browser identifiers.

68. Importantly, the Website uses multiple Google Ads and Google Analytics tracking IDs, creating a robust cross-platform tracking system capable of following users outside of the Website and across the internet.

**C. Defendant Aided and Abetted Third-Party Interception by Installing and Using Trackers on the Website to Collect Plaintiff's and Class Member's Communications Without Consent or Court Order**

69. Section 631 of CIPA prohibits the interception of communications without the consent of all parties and provides that a person who aids, abets, employs, or conspires with another to intercept communications may also be liable. Cal. Penal Code § 631(a).

70. In the internet context, courts repeatedly recognize that a third party becomes an unauthorized interceptor when a website embeds tracking technology that captures user communications in real time and permits the third party to use the intercepted communications for its owner commercial purposes. See *Smith v. Rack Room Shoes, Inc*., 2025 WL 1085169 at *4 (N.D. Cal. Apr. 4, 2025)(rejecting the argument that the trackers were not unauthorized third parties but "extensions" of the website); *Ambriz v. Google, LLC*, 2025 WL 830450 (third party trackers who have the capability to use the information transmitted are unauthorized parties regardless of their intent).

71. Defendant owns and operates the Website, https://www.findlaw.com/, which is an online legal platform that provides access to legal information and a lawyer directory.

72. Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and other users visited the Website. Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

73. As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser so that it can be executed within the context of that website. Scripts, including tracking software, must be (re-)installed into the browser for each website that uses them, and so Defendant is solely responsible for the installation of the tracking software that will execute on its website.

74. Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the identifying information and user behavior and activity from Class Members and transmits that data to the third-parties that developed and operate the Trackers in real time.

75. The operators of the Trackers then use the correlated information of users, including those of Plaintiff and Class Members, for their own commercial purposes, including targeted advertising, marketing, and website analytics.

76. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers or to transmit the information collected to the unauthorized third-party Trackers.

77. Defendant programmed the Trackers to deploy immediately upon a user landing on the Website. The website does not deploy any type of consent mechanism which would allow users to configure their privacy choices.

78. Therefore, Defendant failed to obtain consent from Plaintiff and the Class Members prior to installing and using the Trackers on the Website, in violation of CIPA Sections 631 and 638.51.

79. Under the ECPA, the consent of one party is also insufficient where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation

of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); see also, *Doe v. Meta Platforms, Inc.* (N.D. Cal. 2023) 690 F. Supp. 3d 1064, 1077.

80. Because Defendant's interception and disclosure of the communications also violates CIPA, as well as California's Comprehensive Data Access and Fraud Act and the right to privacy under the California Constitution, discussed *infra*, consent by United alone is insufficient to shield it from liability under the ECPA. See *Smith v. Rack Room Shoes, Inc*., *supra,* 2025 WL 1085169 at *5 (the website tracking allegations are analogous to the purpose of engaging in a HIPPA violation, which courts consistently find constitutes an independent prohibited purpose.").

**D. Defendant's Conduct Constitutes an Unauthorized Interception of the Contents of Communications under CIPA and the ECPA**

81. Because the Trackers intercept information about the Website visitors' interactions with the Website, Defendant's use of the Trackers constitutes an unlawful interception and disclosure of an "electronic communication" under Section 2511 of the ECPA.

82. Defendant's use of the Trackers also constitutes an "unauthorized connection" which "reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication" under Section 631 of CIPA.

83. "Contents" of a communication refer to "any information concerning the substance, purport, or meaning of a communication." *In re Zynga Priv. Litig*. (9th Cir. 2014)750 F.3d 1098, 1106–07)(internal quotations omitted). This includes button clicks, viewing history, cart history, or any other information that reveals a user's personal interests, queries, or habits. See also, *Mikulsky v. Bloomingdale's, LLC*, 2025 WL 1718225, at *1 (9th Cir. June 20, 2025)(session recording technology constitutes "contents" for the purposes of Section 631 of CIPA).

84. The communications intercepted by the Trackers, which includes a session recorder, are "contents" within the meaning of CIPA and the ECPA because they reveal substantive information about the user's interests, preferences, and potential consumer behavior.

**E. Defendant's Conduct Constitutes an Illegal Pen Register and Trap and Trace Device Under CIPA**

85. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

86. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

87. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

88. In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

89. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

90. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address(es) the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

91. Defendant executes each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information that identifies the outgoing "routing, addressing, or signaling information" of the user by through the collection of IP addresses through the 95 third-party trackers, as well as the device fingerprinting techniques and unique identifiers described above. Accordingly, the Trackers are each "pen registers."

92. The Trackers are "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

93. The Trackers are a "device" because "in order for software to work it must be ran on some kind of computing device." *James v. Walt Disney Co*., 701 F.Supp.3d 942 (N.D. Cal. Nov. 8, 2023).

94. Because the Trackers capture outgoing information that capture the source of a communication, they are a "pen register" for the purposes of CIPA section 638.50(b).

**F. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

95. The collection of Plaintiff's and Class Members' personally identifying, nonanonymized identifying information, and Website activity through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

96. As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

## III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES

97. Plaintiff Scott Evans visited the Website in and around September 2025 to do research on a landlord-tenant issue. While on the Website, he entered several search terms related to his legal issue, including "keeping deposit from landlord in bad faith" and "civil law 1950.5."

98. As soon as Plaintiff landed on the Website, Defendant's code caused multiple tracking technologies to immediately begin identifying Plaintiff by collecting data on his browser and device characteristics, including through canvas fingerprinting scripts.

99. Defendant deployed at least five instances of canvas fingerprinting on the Website through scripts executed via Google Tag Manager and associated Google Ads and Google Analytics tracking infrastructure, which collected data such as canvas font rendering, canvas geometry, and related device characteristics to generate a unique identifier associated with Plaintiff's device.

100. Defendant further transmitted Plaintiff's data through over one hundred third-party tracker requests to external entities, including advertising, analytics, and social media services.

101. Using these tracking technologies, Defendant and its third-party partners monitored Plaintiff's activity on the Website, including the pages he viewed and his interactions with legal content.

102. Defendant also deployed a session recording tool on the Website, specifically Microsoft Clarity, which recorded Plaintiff's browsing session in real time, including mouse movements, clicks, and scrolling behavior as Plaintiff navigated legal information.

103. This session recording technology captured information about Plaintiff's interactions with the Website, including page content viewed and behavioral engagement data, and transmitted that information to third-party operators.

104. In addition, Defendant deployed the Meta Pixel, which collected and transmitted Plaintiff's browsing data—including page views, IP address, browser and device information, and referring URL—to Meta.

105. The Trackers also collected Plaintiff's IP address and related geolocation data, as well as unique identifiers stored in cookies and generated through fingerprinting techniques.

106. These identifiers enabled Defendant and third parties to aggregate Plaintiff's data into a behavioral profile used for analytics, advertising, and cross-site tracking.

107. Defendant used the information collected through these Trackers and shared it with third parties to analyze Website usage, conduct targeted advertising, and increase revenue.

108. Shortly after visiting the Website, Plaintiff noticed an increase in targeted advertising related to the legal topics he had researched.

109. Plaintiff and Class Members did not provide their prior consent to Defendant to install or use the Trackers on their browsers, and the Website did not present a consent banner or provide a meaningful opportunity to opt out before such tracking occurred.

110. Defendant did not obtain a court order before installing or using the Trackers.

111. Thus, like Plaintiffs, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a).

112. Plaintiff seeks to access the Website without third-party tracking technologies intercepting and disclosing his communications or personal data, or, alternatively, to be provided with a meaningful choice regarding what data is collected.

## CLASS ACTION ALLEGATIONS

113. Class Representative Plaintiff brings this action on their own behalf and on behalf of all other persons similarly situated. The putative class that Class Representative Plaintiffs seek to represent is composed of:

> **Nationwide Class**
>
> All United States residents who accessed the Website and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent two years prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Class").
>
> **California subclass**
>
> All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent one year prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Subclass").

114. Excluded from the Class are the natural persons who are directors, and officers, of the Defendant, as well as judicial officers and attorneys of record, their families, and their staff who are assigned to this action. Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

115. Plaintiff is informed and believe that the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown

to Class Representative Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

116. There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

117. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Defendant unlawfully read and/or intercepted communications by Plaintiff and members of the Class through use of the Trackers;

(b) Whether the Defendant unlawfully collected routing, addressing, and signaling information from Plaintiff and members of the Class through use of the Trackers;

(c) Whether Defendant violated CIPA section 631(a);

(d) Whether Defendant violated CIPA section 638.51(a);

(e) Whether Defendant violated the Wiretap Act, 28 U.S.C. section 2510 et seq.;

(f) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);

(g) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(h) Whether Defendant sought or obtained a court order for its use of the Trackers; and

(i) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiffs, like every other Class member, were exposed to virtually identical conduct and are entitled to the same relief under the CIPA.

118. Class Representative Plaintiff will fairly and adequately protect the interests of the

Class. Moreover, Class Representative Plaintiff has no interest that is contrary to or in conflict with those of the Class they seek to represent during the Class Period. In addition, Class Representative Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intend to prosecute this action vigorously.

119. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendant in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

120. Proper and sufficient notice of this action may be provided to the Class members through direct mail.

121. Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the practices of Defendant.

## <u>CAUSES OF ACTION</u>

## <u>FIRST CAUSE OF ACTION</u>

### Violation of the California Invasion of Privacy Act,

### Cal. Penal Code § 630, et seq.(a)

### (California subclass only)

122. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

123. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

124. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

125. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

126. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

127. Defendant used tracking software, pixels, cookies, scripts, browser-storage mechanisms, session-recording technology, and fingerprinting processes on the Website to intercept, read, learn, record, and transmit information about Website visitors' communications, behavior, and activity on the Website. Defendant caused these tracking technologies to operate immediately upon page load and before users were presented with any meaningful consent opportunity, cookie-consent banner, pop-up opt-out mechanism, or granular tracking controls.

128. Defendant's tracking technologies included, among others, Microsoft Clarity session-recording technology, Microsoft Advertising/Bing tracking, Google Analytics, Google Ads, Google Tag Manager, Google/DoubleClick tracking, Meta/Facebook Pixel tracking, Adobe Analytics, Adobe Experience Cloud, Adobe Audience Manager, and Cludo search functionality.

These technologies caused Plaintiff's and Class Members' Website communications and activity to be disclosed to third parties while users were interacting with Defendant's Website.

129. Defendant's Website deployed at least 102 third-party tracker requests on desktop and at least 105 third-party tracker requests on mobile, across dozens of third-party domains, together with approximately 40 to 41 cookies, five canvas-fingerprinting instances, one Microsoft Clarity session recorder, and one Meta/Facebook Pixel PageView event. These technologies collected and transmitted, among other things, users' IP addresses, URLs visited, referrer information, timestamps, user-agent strings, browser and device characteristics, unique cookie identifiers, advertising identifiers, geolocation information, page views, search activity, and engagement data.

130. Defendant's interception and disclosure of Plaintiff's and Class Members' communications was especially intrusive because the Website is a legal-information and attorney-referral website. Users visit the Website to research private legal issues and seek legal assistance. Defendant's tracking technologies operated on legal-search pages, including pages reflecting searches, and the Website stored that legal-search phrase in browser local storage as a recent search. Thus, Defendant's tracking did not merely collect generic technical information; it revealed the substance, meaning, and context of users' sensitive legal research.

131. Defendant's Microsoft Clarity session-recording technology captured or enabled the capture of users' Website sessions, including screen activity, cursor movements, clicks, scrolling behavior, page content, and interactions with the Website. Such session-recording technology allows Defendant and its third-party vendor to observe how users interact with legal-search pages and legal-content pages, thereby learning the contents and meaning of users' communications with the Website.

132. Defendant's Meta/Facebook Pixel caused information about users' Website visits to be transmitted to Meta, including page URLs, timestamps, IP addresses, browser information, referrer information, device information, and identifiers associated with the Facebook Pixel. Defendant's Google, DoubleClick, Microsoft, Adobe, and other tracking technologies similarly collected and transmitted identifiers and routing, addressing, signaling, and behavioral information

that enabled third parties to recognize users, measure conversions, retarget users, and profile users based on their legal-search activity.

133. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

134. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

135. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

136. At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers and used the Trackers to collect identifying information of Plaintiff and Class Members, including IP addresses.

137. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

138. Defendant did not obtain a court order to install or use the Trackers.

139. Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 631(a) and 638.51(a), and each seeks injunction and statutory damages of $5,000 for each of Defendant's violations of CIPA section 631(a) and 638.51(a).

## <u>SECOND CAUSE OF ACTION</u>

### Violation of the Wiretap Act

### Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq.*)

140. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

141. The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the

contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

142. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

143. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

144. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

145. Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

146. Defendant is a corporation and is therefore a "person" for purposes of § 2510(6).

147. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(a) when it installed Trackers on Plaintiff's browsers, which then intercepted and collected Plaintiff's identifying information, as well as dozens of other data points that revealed Plaintiff's and Class Members' behavior and activity on the Website without their consent.

148. Defendant caused this tracking to occur immediately upon page load and before users were provided any meaningful opportunity to consent. On desktop, Defendant's Website deployed approximately 41 cookies, 102 third-party tracker requests, five canvas-fingerprinting instances, one session recorder, and one Meta/Facebook Pixel PageView event. On mobile, Defendant's Website deployed approximately 40 cookies, 105 third-party tracker requests, five canvas-fingerprinting instances, one session recorder, and one Meta/Facebook Pixel PageView event.

149. Defendant's interception captured information concerning the substance, purport, and meaning of users' communications with the Website, not merely anonymous technical routing information. The Website was a legal research and attorney-referral website, and users visited it to search for and review sensitive legal information. Defendant's Trackers operated on legal-search pages, including a page reflecting the legal search and Defendant's Website stored that legal-search

phrase in browser local storage as a recent search. This search phrase and related page activity revealed the specific legal problem being researched by the user.

150. Defendant's Trackers acquired and transmitted users' page URLs, full or partial legal-search URLs, page views, legal content viewed, timestamps, referrer information, IP addresses, user-agent strings, browser information, device characteristics, cookie identifiers, advertising identifiers, local-storage identifiers, session identifiers, click activity, scrolling behavior, mouse movements, engagement patterns, and other information reflecting how users interacted with the Website. In context, this information disclosed the legal topics users researched, the pages they viewed, the timing and sequence of their activity, and the meaning of their communications with Defendant's Website.

151. Defendant's Microsoft Clarity session-recording technology captured or enabled the capture of users' Website sessions, including screen activity, cursor movements, clicks, scrolling behavior, page content, and user interactions with the Website. Defendant also deployed Microsoft Clarity identifiers, including cookies such as _clck, _clsk, CLID, MUID, MR, and ANONCHK, which allowed user sessions and behavior to be associated with persistent identifiers and analyzed over time.

152. Defendant's Meta/Facebook Pixel caused users' Website activity to be transmitted to Meta, including PageView events, page URLs, timestamps, IP addresses, browser information, referrer information, device/browser information, and the Facebook Pixel ID. Defendant's Google, DoubleClick, Microsoft, Adobe, and other third-party tracking technologies similarly caused user communications and activity to be disclosed to outside entities for analytics, advertising, conversion measurement, audience segmentation, behavioral profiling, and retargeting.

153. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(c) when it disclosed Plaintiff's and Class Members' identifying information, behavior, and activity, obtained from the Trackers to third parties without their consent.

154. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) when it used Plaintiff's identifying information, behavior, and activity obtained from the Trackers for its own advertising and marketing purposes without their

consent.

155. As a result of Defendant's violations of the Wiretap Act, Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights, loss of their information and loss of money and costs incurred, all of which have ascertainable value to be proven at trial.

156. Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

## THIRD CAUSE OF ACTION

### Violation of the California Computer Data Access and Fraud Act

### (California Penal Code § 502)

### (California subclass only)

157. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

158. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

159. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

160. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or

communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

161. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

162. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

163. Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

164. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

165. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address are both "data" within the meaning of the statute.

166. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

167. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

168. The CDAFA further prohibits any person from knowingly accessing and without

permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

169. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

170. Based on Defendant's unauthorized installation and storage of third-party tracking technology on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

171. Similarly, the installation of the Trackers violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

172. By installing third-party tracking technology, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

173. Further, Defendant's unauthorized collection and disclosure of Plaintiff's and Class members' personally identifying and addressing information to undisclosed third parties violates Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class members' computers, computer systems, or computer networks.

174. Plaintiff and Class members are citizens of California, and used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data and other personally identifying information from within California.

175. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class members' data and computer systems without their permission or consent, and

using all of that identifying information to maximize revenue from selling advertising space on the Website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

176. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

177. Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**FOURTH CAUSE OF ACTION**

**Invasion of Privacy**

**(Violation of Art. 1, § 1, California Constitution)**

**(California subclass only)**

178. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

179. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

180. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

181. Plaintiff and Class members have a legally protected privacy interest in their personally identifying information and addressing information that are captured, without notice or consent, when they access and view the Website. These privacy interests are recognized by the

California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

182. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class members were not aware of and could not have reasonably expected that Defendant would use website tracking technology and install third-party tracker cookies without notice or obtaining consent. Those unauthorized Trackers collected and transmitted to undisclosed third parties Plaintiff's and Class members' communications and personally identifying and addressing information, including their IP addresses, which contain geolocation data.

183. Defendant's unauthorized (1) installation of the Trackers and (2) collection and disclosure to third parties of Plaintiff's and Class members' communications and personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class members, are an invasion of Plaintiff's and Class members' privacy.

184. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose those communications and personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the Website, and the Trackers did not have authorization to collect and use that information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

185. As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

186. Plaintiff and the Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and any and all

other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

187. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**(Violations of the CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §17200, *et seq.*)**

188. Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

189. Violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices that constitute "unfair competition" as defined in the UCL, including, but not limited to, the following:

a. by violating the provisions of the CIPA prohibiting unauthorized wiretapping, Cal. Pen. Code § 631, *et. seq*.;

b. by violating the provisions of the ECPA prohibiting unauthorized wiretapping, 18 U.S.C 2510, *et. seq*.;

c. by violating the provisions of the CIPA prohibiting unauthorized trap and trace, Cal. Pen. Code § 638.51;

d. by violating the CDAFA, Cal. Pen. Code § 502, *et. seq.;*

190. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff. Defendant's practice was also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities do not share, collect, or transmit data without consumer consent, as reflected by laws like the CIPA, Cal. Penal Code §§ 631 & 632, the CDAFA, Cal. Penal Code § 502, *et seq*.; the California Trap and Trace Law, Cal. Penal Code § 638.51; and the ECPA, 18 U.S.C. § 2510, *et. seq*.

191. As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiffs were injured and lost money or property, including but not limited to the loss of their legally protected interest in the privacy of their personal information, data, and communications. In addition, Defendant treated the personal information, data, and communications of Plaintiffs as its own property, and sold and/or otherwise used it for profit, causing a loss of money and property

to Plaintiffs.

192. Defendant knew or should have known that its sale of information to unauthorized third parties would violate the CIPA, ECPA, and CDAFA. Defendant's actions in engaging in the above-named unfair practice and deceptive acts were intentional, knowing, and willful, and/or wanton and reckless with respect to the rights of the Plaintiffs.

193. Plaintiffs seek relief under the UCL, including declaratory relief, attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief.

## DEMAND FOR JURY TRIAL

194. Plaintiff and the Class hereby demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. For an order certifying the Class, naming Plaintiff as the representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;
2. For an order declaring that Defendant's conduct violates the statutes referenced herein;
3. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;
4. For statutory damages of $5,000 for each violation of CIPA section 631 and 638.51(a);
5. For statutory damages of $10,000 for each violation of the Federal Wiretap Act;
6. For pre- and post-judgment interest on all amounts awarded;
7. For an order of restitution and all other forms of equitable monetary relief; and
8. For an order providing injunctive and other equitable relief as necessary to protect the Plaintiff's interests as requested herein, including, but not limited to:
   a. Ordering that Defendant immediately cease and desist the unauthorized interception, transfer, release, sale, and disclosure of Plaintiffs' data;
   b. Ordering that Defendant remove, block, disable, control, update, manage, and audit any code, software, hardware, operations, systems, policy, procedure, protocols, and processes that allow all unauthorized third parties to intercept,

access, copy, collect, take, open, view, monitor, mine, analyze, store, sell, gain, exchange, or otherwise use Plaintiffs' data;

c. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner data not necessary for its provision of services.

9. For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: April 22, 2026

**POTTER HANDY LLP**

By: /s/ James M. Treglio
James M. Treglio, Esq.
Mark Potter, Esq.
Isabel Rose Masanque, Esq.
Attorneys for Plaintiffs